**Marlene SKINNER, as Legal Representative for William Skinner, Jr., Deceased, Petitioner,**

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–1051V.

United States Court of Federal Claims.

Sept. 28, 1994.

Peter H. Bouman, Binghamton, NY, for petitioner.

Tarek Sawi, U.S. Dept. of Justice, Washington, DC, for respondent.

## OPINION

WIESE, Judge.

On May 31, 1994, the special master issued a decision in this case granting petitioner's claim to compensation under the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa–1–300aa–34 (West 1991 & Supp. 1994) ("Vaccine Act") for the vaccine-related death of her infant son, William ("Billy") Skinner, following his receipt of a diptheria-pertussis-tetanus (DPT) vaccine on February 23, 1984. Petitioner had premised her claim to compensation on a theory of "significant aggravation" of an underlying seizure disorder. However, in resolving the case in petitioner's favor, the special master decided on a different ground, to wit: that Billy's death was the result of a vaccine-caused encephalopathy as manifested by a reoccurrence of seizures within the three-day period following administration of the vaccine. Although the record offered no expert medical testimony specifically supporting such a finding, nevertheless, the special master was persuaded to rule as she did based on her reading of the Federal Circuit's decision in *Whitecotton v. Secretary of Dep't of Health and Human Servs.*, 17 F.3d 374 (Fed.Cir.1994).

Respondent now appeals on the ground that the special master's application of *Whitecotton* reflects a misunderstanding of that decision and is therefore incorrect as a matter of law. We agree. Accordingly, we vacate the decision and remand the matter to the special master for further proceedings.

## I

Billy was born on December 20, 1983. On January 17, 18 and 19, 1984, Billy experienced five episodes during which his arms and legs became rigid, his head and neck arched, and his eyes rolled back. Each of these episodes lasted from thirty seconds to one minute. Both parties' experts identified these episodes as seizures.

Billy received his DPT vaccination on February 23, 1984. The next two days were uneventful. Then, on February 25th, while seated in a crib swing, he began screaming, his arms and legs became stiff, and his body shook violently. In her testimony, Billy's mother recalled observing three of these episodes on February 25th, each lasting for a few seconds. As a result of these occurrences, Billy was hospitalized. However, neurological examinations performed during this hospitalization revealed no abnormal results, and he was therefore discharged two days later.

Following a brief period of tranquility, seizures began again on March 2, 1984, and thereafter steadily increased in frequency. During April, 1984 for example, he experienced over one hundred seizures in a single day. The etiology of Billy's recurrent seizures was unknown. Billy was hospitalized on numerous occasions; his health deteriorated rapidly and on April 15, 1985, he died.

## II

As noted, petitioner presented her case as a significant aggravation claim. Hence, all the evidence was directed to the question whether Billy's death was a sequela to a seizure disorder that had been significantly aggravated by the DPT vaccination. To that end, petitioner presented an expert who testified that the seizures Billy suffered on February 25, 1984, two days after vaccination, were significantly worse than the seizures he had experienced from January 17 through January 19, 1984. Respondent countered that petitioner's expert's clinical assessment was based on a factually incorrect understanding of the frequency as well as the duration of Billy's pre-vaccinal seizures. Additionally, respondent offered the testimony of an expert who testified that the February 25th seizures took the heightened form they did due to the natural progression of Billy's pre-existing neurological condition rather than to any vaccine-related aggravation.

The special master bypassed all of this testimony for, in her view, the nature and extent of Billy's pre-existing seizure disorder was essentially irrelevant to the outcome. In the special master's consideration of the case, it was enough to note that Billy experienced seizures within the three-day period following administration of the vaccine; hence, pursuant to the *Whitecotton* decision (as interpreted by the special master), such seizures were enough to confirm the existence of a separate Table injury, *i.e.*, an encephalopathy.

The special master has misread the *Whitecotton* decision. The claimant in that case, Margaret ("Maggie") Whitecotton, was afflicted from birth with microcephaly—a chronic organic brain syndrome of unknown origin. However, until she received her third diphtheria-pertussis-tetanus vaccination in August of 1975, Maggie was seen as a healthy child, developmentally and physically. The question in the case was whether Maggie's later-expressed disabilities—mental and physical disorders, cerebral palsy and hip and joint problems—were attributable to an encephalopathy that occurred within three days of the administration of the DPT vaccine (as petitioners contended) or were, instead, manifestations of an on-going neurological deterioration traceable to her pre-existing disorder (as respondent contended).

In deciding the case in respondent's favor, the special master in *Whitecotton* had before him undisputed evidence showing that Maggie had experienced a series of clonic seizures within the three-day period following administration of the DPT vaccine. The record also revealed—and this too stood unchallenged—that it was the opinion of the physicians who treated Maggie during her August hospitalization that she had suffered a post-immunization encephalopathy. Notwithstanding this evidence, however, the special master decided against the petitioners based on a finding that Maggie was encephalopathic even prior to August, 1975 (as evidenced by her microcephaly), and that her subsequent disabilities were essentially indistinguishable "from what would reasonably have been expected considering her microcephaly." *Whitecotton v. Secretary of the Dep't of Health and Human Servs.*, No. 90–692V, 1991 WL 172187, slip op. at 12 (Fed.Cl.Sp. Mstr., Aug. 16, 1991). In other words, the post-vaccinal condition was not seen by the special master as a case of significant aggravation of a pre-existing neurological disorder. Hence petitioners did not prevail.

■ The court of appeals held the case was wrongly decided for two basic reasons. First, the court considered the special master's decision incorrect because the decision improperly ignored clear evidence of a Table injury and focused, instead, on Maggie's pre-vaccinal condition. That disregard of a *prima facie* case was an analytical misstep. As the court of appeals explained, "[n]owhere does the statute expressly state that proof of a Table encephalopathy includes a showing that the child sustained no injury prior to

administration of the vaccine.... [T]he Table language is that the first symptom *after vaccine administration* must occur within Table time, not, as the Secretary argues, that the first of all manifestations [of injury] must ·so occur." 17 F.3d at 376. Thus, properly viewed, petitioner's evidence was enough to demonstrate the existence of a Table injury.

■ Second, the court of appeals saw legal error in the special master's conclusion that Maggie's post-vaccinal state was the product of her pre-existing disorder rather than the consequence of a presumed vaccine-caused injury. Reliance on Maggie's microcephaly as proof of alternate causation for her injuries was prohibited—the court noted—because the Vaccine Act itself declares such evidence inadmissible. As the appellate court's opinion points out, proof of alternate causation, what the Vaccine Act refers to as "factors unrelated to the administration of the vaccine," 42 U.S.C. § 300aa–13(a)(2)(A), may not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition...." *Id.* Since Maggie's microcephaly was an idiopathic brain disorder (meaning a disorder of unknown origin), it could not be relied upon to overcome the presumption of vaccine causation that arises upon proof of a Table injury.

These two holdings then, are the sum and substance of the *Whitecotton* decision. Do they have any application to the case at hand? At this juncture, none at all. The special master, of course, thought otherwise. In her understanding of it, *Whitecotton* did not involve the disregard of an *acknowledged* Table encephalopathy but, rather, the disregard of clinical data sufficient to support the court's own independent determination of encephalopathy. Critical to this view of the case is that language in the appellate opinion where the court had said that "Maggie's encephalopathy manifested itself in the form of seizures occurring within Table time after vaccination." 17 F.3d at 377. The special master took these words as authority upon which to construct her own determination of encephalopathy. Said the special master: "Using the *Whitecotton* rationale, the seizures Billy experienced within the Table time

period are enough to establish a Table encephalopathy." *Skinner v. Secretary of the Dep't of Health and Human Servs.*, No. 90–1051V, 1994 WL 268266, slip op. at 11 (Fed. Cl.Sp.Mstr. May 31, 1994).

■ The special master has misread the court of appeals' opinion. The appellate court's words are simply words of recapitulation—a reiteration of the evidence on which the medical experts had based their assessment of encephalopathy; they are not words signaling the court's own independent pronouncement of the medical significance of the evidentiary record. Nor could they be. Courts are not empowered or competent to render medical judgments. In their evaluation of claims involving medical determinations, "judges ..: must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990). The diagnosis of encephalopathy was in the case because the medical experts put it there; not the court.

In the instant case, by contrast, there was no medical testimony to support the conclusion that the seizures which Billy experienced within three days of the administration of the DPT vaccine were indicative of a then-occurring encephalopathy. Indeed, petitioner's own expert conceded that he could not declare to a reasonable degree of medical certainty that Billy had suffered an encephalopathy within the Table time period. It follows therefore that the determination of encephalopathy cannot stand.

■ Thus, the case is once again in the posture in which it stood at the conclusion of the evidentiary proceedings before the special master—it awaits a determination on the issue of whether the events that befell Billy Skinner following the administration of the DPT vaccine on February 23, 1984, make out a case of significant aggravation of a pre-existing seizure disorder. Petitioner has asked that we resolve this issue on our own rather than remand to the special master. In the ordinary case we would do so. Here, however, the interests of justice seem to us better served by returning the case to the special master for further proceedings. We are persuaded to follow this course because

the evidence on both sides seems to us quite meager and thus perhaps better evaluated by a fact-finder who not only heard that evidence first hand but also whose greater familiarity with Vaccine Act cases in general can be expected to contribute to a more informed judgment.

## III

For the reasons stated, the decision entered by the special master in this case on May 31, 1994, is vacated. The case is remanded to the special master for a determination of petitioner's claim to compensation under the Vaccine Act for the "significant aggravation" of William Skinner's pre-existing seizure disorder.